# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICK CUDDIHEY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MITEL NETWORKS CORPORATION, TERENCE H. MATTHEWS, RICHARD D. MCBEE, JOHN P. MCHUGH, PETER D. CHARBONNEAU, BENJAMIN H. BALL, DAVID M. WILLIAMS, MARTHA H. BEJAR, and SUDHAKAR RAMAKRISHNA, <br><br> Defendants. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9** <br><br> 2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Rick Cuddihey ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.       This is a class action brought by Plaintiff on behalf of himself and the other shareholders of Mitel Networks Corporation ("Mitel" or the "Company"), except Defendants (defined below) and their affiliates, against Mitel and the members of Mitel's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Item 1015 of Reg M-A, 17 C.F.R. 229.1015, in connection with the proposed acquisition (the "Proposed Transaction") of Mitel by  affiliates of Searchlight Capital Partners, L.P. ("Searchlight").

2.      On April 23, 2018, the Board caused the Company to enter into an Arrangement Agreement (the "Arrangement Agreement") with the Searchlight, pursuant to which, Mitel shareholders will receive $11.15 for each share of Mitel stock they own (the "Buyout Price").

3.      On, June 8, 2018, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act and set a special meeting of Mitel shareholders to vote on the Proposed Transaction for July 10, 2018.

4.      While Defendants are touting the fairness of the Buyout Price to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisors, Jefferies LLC ("Jefferies") and National Bank Financial Inc. ("NBF" and together with Jefferies, the "Financial Advisors"), in support of their fairness opinions; (iii) the background of the Proposed Transaction; and (iv) and the compensation details of NBF.

5.      It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote on July 10, 2018, so that they can properly exercise their corporate suffrage rights.

6.      For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Reg M-A. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the

material information discussed below is disclosed to Mitel shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice. Specifically, Mitel maintains offices in New York, NY and does business in New York, NY; Mitel common stock is traded on the NASDAQ stock exchange, which is based in New York, NY; Mitel retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), a law firm headquartered in New York, NY, as their legal counsel in connection with the Proposed Transaction; Mitel engaged in negotiations and entered into the Arrangement Agreement with Searchlight, which is headquartered in New York, NY; and Mitel retained Jefferies, which is headquartered in New York, NY, as the Company's financial advisor.

9.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because NASDAQ's, Jefferies', Seachlight's, and Paul, Weiss' offices are located in this District, such that a substantial portion of the occurrences and wrongdoing complained of herein, including the review and preparation of the contents of the Proxy, occurred in this District.

## PARTIES

10.    Plaintiff is, and has been at all relevant times, the owner of Mitel common stock and held such stock since prior to the wrongs complained of herein.

11.    Defendant Mitel is a Canadian Corporation with its principle executive offices located at 350 Legget Drive, Ottawa, Ontario, Canada K2K 2W7.  Mitel is a global market leader in business communications powering more than two billion business connections. Mitel's common stock trades on the NASDAQ under the symbol "MITL."

12.    Individual Defendant Terence H. Matthews is director of Mitel and Chairman of the Board.

13.    Individual Defendant Richard D. Mcbee is a director of Mitel and the President and Chief Executive Officer of the Company.

14.    Individual Defendant John P. Mchugh is, and has been at all relevant times, a director of Mitel.

15.    Individual Defendant Peter D. Charbonneau is, and has been at all relevant times, Lead Director of Mitel.

16.    Individual Defendant Benjamin H. Ball is, and has been at all relevant times, a director of Mitel.

17.    Individual Defendant David M. Williams is, and has been at all relevant times, a director of Mitel.

18.    Individual Defendant Martha H. Bejar is, and has been at all relevant times, a director of Mitel.

19.    Individual Defendant Sudhakar Ramakrishna is, and has been at all relevant times, a director of Mitel.

20.    The parties identified in ¶¶ 11-19 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Mitel common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

22.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. As of the close of business on June 7, 2018, Mitel had an estimated 122,610,789 common shares outstanding and approximately 1,324 holders of record held such shares.

(b)    The holders of these shares are believed to be geographically dispersed through the United States;

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

  i.    Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

  ii.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

  iii.    Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Transaction as presently anticipated.

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.     Background and the Proposed Transaction

23.     Mitel, incorporated on January 31, 2014, is a provider of business communications and collaboration software, services, and solutions. The Company operates through three segments: Enterprise, Cloud, and Mobile. The Enterprise segment sells and supports products and services for premise-based customers. The Cloud segment sells and supports products that are deployed in a cloud environment. The Mobile segment sells and supports software-based telecommunications networking solutions that enable mobile service providers to deliver IP-based voice, video, rich communications, and enhanced messaging services to their subscribers. Through direct and indirect channels, as well as technology partnerships, the Company serves customers in the United States and the rest of North and South America (collectively, the Americas), Europe, the Middle East, and Africa (collectively, EMEA), and Asia-Pacific regions. The Company's product portfolio includes premises and cloud-based enterprise communications infrastructure

products and solutions, unified communications and collaboration (UCC) and contact center applications and a range of service offerings.

24.    Searchlight is a private equity firm specializing in investments in business acquisitions, growth equity, recapitalizations, complex situations, distressed-debt-for-control, and leveraged buyouts. It has $3.9 billion of assets under management. Searchlight's funds invest in companies in various sectors, including communications, media, consumer and business services. The firm invests globally with a focus on companies seeking to expand in North America, Latin America, and Europe. It seeks to become the controlling shareholder in its portfolio companies but it can also consider non-controlling shareholdings with influential governance rights. It invests in both equity and debt of companies. The principal place of business and principal office of Searchlight is 745 Fifth Avenue, 27th Floor, New York, New York 10151.

25.    In the year leading up to the announcement of the Proposed Transaction, Mitel experienced a period of strong financial growth. During that 52-week period Mitel's stock price (MITL) increased over 50% from trading at $6.76 on April 21, 2017, to trading at $10.16 on April 23, 2017 (the day prior to the announcement of the Proposed Transaction), as illustrated by the chart below:



26.     On March 13, 2018, Mitel announced that independent research firm Synergy Research Group had confirmed its lead in unified communications as a service (UCaaS) subscriber growth for the fourth quarter of 2017 as the company added more seats than the combined totals of three of its competitors. Reflecting continued strong demand, Mitel's overall UCaaS subscriber numbers also increased more than 60 percent compared with the previous year.

27.     On March 15, 2018, Mitel announced an expansion of its partnership with ScanSource (Nasdaq:SCSC) to streamline the distribution of its on-site products in the United States and to better equip U.S. partners with the high-value tools, services, and support needed to grow. The announcement was the next in a series of strategic steps to align Mitel's go-to-market approach globally.

28.     On March 22, 2018, Mitel announced an agreement to sell DeTeWe to German ICT systems integrator Ostertag Group. Individual Defendant McBee stated: "This is a win-win that

sets Ostertag and Mitel up for growth and success as businesses in Germany begin to pivot to cloud-enabled solutions to help digitally transform their operations."

29.     Each of these events represents a gain for the Company and together they contributed to a surge of the trading price of Mitel, raising the stock price of the Company over a dollar per share in the month of March alone.

30.     April 24, 2018, Mitel issued a press release to announce the Proposed Transaction stating, in relevant part, as follows:

### Mitel Enters into Definitive Arrangement Agreement to be Acquired by Affiliates of Searchlight Capital Partners for $2.0 Billion

- •   Mitel shareholders to receive $11.15 per share in cash
- •   Transaction provides immediate liquidity and certainty of value to Mitel shareholders
- •   Purchase price represents a 24% premium over the 90-calendar-day weighted average price

Mitel® (Nasdaq:MITL) (TSX:MNW), a global leader in business communications, today announced that it has signed a definitive arrangement agreement to be acquired by an investor group led by affiliates of Searchlight Capital Partners, L.P. ("Searchlight") in an all-cash transaction valued at approximately $2.0 billion, including Mitel's net debt. Under the terms of the agreement, to be completed pursuant to a plan of arrangement, upon completion Mitel shareholders will receive $11.15 per common share in cash. This exceeds Mitel's 52-week and last three-year-high price and represents a premium of approximately 24% to the 90-calendar-day volume-weighted average price of Mitel common shares through April 23, 2018. Upon completion of the transaction, Mitel will become a privately held company, which is expected to provide the company with additional flexibility to accelerate its move-to-the-cloud strategy.

The Mitel Board of Directors has unanimously determined that the transaction is in the best interests of Mitel and fair to Mitel shareholders, and will recommend that Mitel shareholders approve the arrangement.

Terry Matthews, Mitel Co-founder and Chairman, said, "Mitel has succeeded for 45 years because of persistent innovation and relentless focus on delivering shareholder value. Our Board determined that this transaction, upon closing, will deliver immediate, significant and certain cash value to our shareholders. It also affirms the tremendous value and market leadership of Mitel. We believe this

transaction will provide Mitel with additional flexibility as a private company to pursue the company's move-to-the-cloud strategy."

Searchlight, a leading private investment firm with investments in North America and Europe, seeks out partnerships for its funds with leading corporations and businesses in which their capital and strategic support can enhance value.

"This transaction is an exciting next step in our multi-year transformation that has enabled Mitel to emerge as an industry leader in the largest markets in the world. As a private company, and with the strategic and capital support of the Searchlight funds, we will have greater flexibility to manage the transition in our market, accelerate our strategy, and drive the next phase of success for our customers, partners, and employees," said Mitel CEO, Rich McBee.

The arrangement is not subject to a financing condition. The transaction is expected to close during the second half of 2018, subject to customary closing conditions, including receipt of shareholder, regulatory and court approvals. The arrangement agreement includes a 45-day "go-shop" period, which permits Mitel's Board of Directors and advisors to actively solicit, evaluate and potentially enter into negotiations with parties that make alternative acquisition proposals through June 7, 2018. There can be no assurance that this process will result in a superior offer. Mitel does not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors makes a determination requiring further disclosure.

Jefferies LLC is serving as financial advisor to Mitel. Paul, Weiss, Rifkind, Wharton & Garrison LLP and Osler, Hoskin & Harcourt LLP are serving as legal advisors to Mitel. National Bank Financial Inc. is serving as independent financial advisor to the Mitel Board of Directors and provided a fairness opinion to the Mitel Board of Directors on a fixed fee basis.

Evercore is serving as lead financial advisor to Searchlight. Wachtell, Lipton, Rosen & Katz and Goodmans LLP are serving as legal advisors to Searchlight. Credit Suisse, BMO Capital Markets and TD Securities Inc. have provided committed debt financing to an affiliate of Searchlight for the transaction and are also providing financial advisory services to Searchlight.

Mitel expects to issue a news release with its Q1 2018 results before markets open on May 3, 2018 but in light of entering into the arrangement agreement will not hold a Q1 2018 conference call.

31.    The Buyout Price is inadequate consideration for Mitel shareholders given the

Company's recent financial success and positive economic outlook. Indeed, $11.15 represents less

than a 10% premium to the Company's trading price immediately prior to the announcement of

the Proposed Transaction. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Transaction.

## II.    The Proxy Is Materially Incomplete and Misleading

32.    On June 8, 2018, Mitel filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote regarding Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

33.    First, the Proxy fails to provide unlevered free cash flow projections for Mitel. These unlevered free cash flows were utilized by both of the Financial Advisors in rendering their fairness opinions, including the discounted cash flow analyses, and are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the Proposed Transaction is clear – is the Buyout Price fair compensation given the expected unlevered free cash flows?  Without unlevered free cash flow projections, the Company's shareholders were not able to answer this question and assess the fairness of the Buyout Price.

34.     The omission of the above-referenced projections renders the financial projections included in the Proxy materially incomplete and misleading.  If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths

35.     Second, with respect to the various *Discounted Cash Flow* Analyses prepared by the Financial Advisors, the Proxy fails to disclose the following key components used in their analyses: (i) the inputs and assumptions underlying Jefferies' selection of the discount rate range of 10.6% to 11.6% (including the WACC components); (ii) the inputs and assumptions underlying NBF's selection of the discount rate range of 10.8% to 12.8% (including the WACC components); (iii) the values of the projected cash and cash equivalents and certain equity interests and promissory notes, projected total debt, unfunded pension obligations and capital leases that Jefferies used to adjust the enterprise value; (iv) the values of net debt, pension and tax attributes NBF used to adjust the enterprise value; and (v) the various terminal values calculated, including the inputs and assumptions underlying their calculation.

36.     These key inputs are material to Mitel shareholders, and their omission renders the summary of the *Discounted Cash Flow* Analyses incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff,

Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate

discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value. For example, a change in the
> discount rate by one percent on a stream of cash flows in the billions of dollars can
> change the discounted cash flow value by tens if not hundreds of millions of
> dollars….This issue arises not only with a discounted cash flow analysis, but with
> each of the other valuation techniques.  This dazzling variability makes it difficult
> to rely, compare, or analyze the valuations underlying a fairness opinion unless full
> disclosure is made of the various inputs in the valuation process, the weight
> assigned for each, and the rationale underlying these choices. The substantial
> discretion and lack of guidelines and standards also makes the process vulnerable
> to manipulation to arrive at the "right" answer for fairness.  This raises a further
> dilemma in light of the conflicted nature of the investment banks who often provide
> these opinions.

Id. at 1577-78.

37.     Further, both of the Financial Advisors include summaries for research analyst

price targets, but fail to provide a complete disclosure of each analyst price target observed. A fair

summary of this analysis requires the disclosure of the individual targets for each analyst observed.

Merely providing a range is insufficient, as shareholders are unable to assess whether the financial

advisor summarized fairly, or, instead, emphasized only the figures that best present the targets in

light of the Buyout Price, i.e. as low as possible. The omission of this information renders the

summary of this analysis included in the Proxy materially incomplete and misleading.

38.     Third, with respect to the *Background of the Transaction*, the Proxy states that Mitel

and multiple parties entered into confidentiality agreements, but fails to disclose whether such

agreements contained a standstill provision and/or a "don't ask don't waive" ("DADW")

provision, including whether those provisions had fallen away upon the execution of the

Arrangement Agreement or were still in effect. The Proxy makes reference to a standstill provision

in the confidentiality agreement executed between Mitel and Searchlight, but fails to provide

similar disclosure for the rest of the confidentiality agreements. Such information is material to Mitel shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. That's not true. If those confidentiality agreements contained DADW provisions, they could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the descriptions of the confidentiality agreements the Company entered into in the *Background of the Transaction* materially incomplete and misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidder in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information, especially in light of the go-shop period.

39. Fourth, and finally, the Proxy fails to disclose the amount of compensation NBF will receive for rendering its fairness opinion. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is plainly material to Mitel shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the transaction to the shareholders, might have.

40. On page 45, the Proxy states: "Under the engagement letter between the Board and NBF, Mitel has agreed to pay NBF a fixed opinion fee that is not contingent on the success of any transaction, which was payable upon delivery of its opinion (regardless of the conclusion reached therein)." However, they fail to disclose the amount of the fee NBF received, or will receive. The omission of compensation details from NBF's agreement to act as financial advisor renders the fee description in the Proxy and NBF's fairness opinion materially incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

41. In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## <u>COUNT I</u>

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

42. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

44.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

45.     Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015

46.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

47.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the Company's financial projections; (ii) the valuation analyses performed by the Financial Advisors; (iii) the Background of the Proposed Transaction; and (iv) the fee received by NBF.

48.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

49.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for Mitel and the details surrounding discussions with other interested parties and the Jefferies.  Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review The Jefferies's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were

negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Arrangement Agreement, the preparation and review of strategic alternatives, and the review of Mitel's financial projections.

51.     Mitel is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

52.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of Mitel within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Mitel, and participation in and/or awareness of the Mitel's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision

making of Mitel, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

55.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Mitel, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual Defendants were thus directly involved in the making of the Proxy.

57.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Arrangement Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these

defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

60.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.  Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.  Rescinding, to the extent already implemented, the Arrangement Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.  Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 19, 2018                    Respectfully submitted,

                                        */s/ Juan E. Monteverde*
                                           Juan E. Monteverde

                                        **MONTEVERDE & ASSOCIATES PC**
                                        The Empire State Building
                                        350 Fifth Avenue, Suite 4405
                                        New York, NY 10118
                                        Tel.: (212) 971-1341
                                        Fax: (212) 202-7880
                                        Email: jmonteverde@monteverdelaw.com

                                        *Counsel for Plaintiff*